Vincent Cefalu v. Commissioner. Frances P. Cefalu v. Commissioner.
Cefalu v. Commissioner
Docket Nos. 40923, 40924.
United States Tax Court
T.C. Memo 1958-37; 1958 Tax Ct. Memo LEXIS 197; 17 T.C.M. (CCH) 155; T.C.M. (RIA) 58037; February 28, 1958
*197 Held: (1) The uncontested deficiencies determined by respondent under the net worth method for the years 1943 and 1944, and the additions to tax under Sec. 293(b), I.R.C. 1939, are not barred by limitations or estoppel. (2) Respondent, with some adjustments thereto, correctly determined the deficiencies in the income taxes of the petitioners under the net worth method for the years 1945, 1946, and 1947. (3) At least a part of the deficiencies for each of the taxable years involved was due to fraud with intent to evade tax and the petitioner, Vincent Cefalu, is liable for the additions to tax imposed by Sec. 293(b), I.R.C. 1939. *198 deQuincy V. Sutton, Esq., for the petitioners. Jackson L. Bailey, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income (or income and victory) tax of petitioners and additions to tax as follows: Additions to Tax
Deficiency in Tax
Section 293(b)
Year
Vincent Cefalu
Frances P. Cefalu
Vincent Cefalu
1943
$ 3,604.58
0
$ 1,802.29
1944
7,361.23
0
3,680.62
1945
21,058.47
$21,058.46
10,529.24
1946
3,095.65
3,095.65
1,547.83
1947
4,011.40
4,131.34
2,005.70
At the hearing and on brief petitioners abandoned certain issues joined in the pleadings. They offered no evidence to refute, and therefore do not question the amount of the deficiencies *199 determined by respondent for the years 1943 and 1944, but rely upon the statute of limitations and estoppel with respect to those years. They no longer question the timeliness of respondent's determination of deficiencies for the years 1945, 1946, and 1947, in view of the written consents (Form 872) executed by petitioners for each of those years and the provisions of section 276(b) of the Internal Revenue Code of 1939. They also no longer question the propriety of respondent's use of the net worth method in computing the deficiencies for the years 1945, 1946, and 1947, but challenge the accuracy of the computations particularly with respect to certain items. The following issues remain in dispute: (1) Whether respondent is barred from assessing and collecting the deficiencies determined for the years 1943 and 1944 by reason of the statute of limitiations or estoppel. (2) Whether respondent correctly determined the deficiencies in the income taxes of the petitioners for the years 1945, 1946, and 1947. (3) Whether the petitioner Vincent Cefalu is liable for the additions to tax provided in section 293(b) of the Internal Revenue Code of 1939, for each of the years 1943 to 1947, *200 inclusive. Findings of Fact Vincent Cefalu (hereinafter referred to as petitioner) and Frances P. Cefalu are husband and wife and reside in Baton Rouge, La. They have five children: Bertie Lou, Sam, Joe C., Madeline, and Ella Marie. Petitioners filed individual income and victory tax or income tax returns with the collector of internal revenue for the district of Louisiana, Vincent for 1943 to 1947, inclusive, and Frances for 1945 to 1947, inclusive. Frances had no separate income but filed individual returns by reason of the community property laws of Louisiana. Petitioners executed timely consents (Form 872), extending the period within which assessments could be made for each of the years 1945 to 1947, inclusive, to June 30, 1952. Jeopardy assessments of the deficiencies and additions to tax were made by respondent on December 26, 1951 and notices of deficiency mailed to petitioners on February 19, 1952. Petitioner was born in Italy and emigrated to the United States in 1912 when not quite 17 years of age. He has resided in Baton Rouge continuously since coming to the United States, and became a naturalized citizen in 1947. Petitioner first obtained employment as a barber *201 at $15 a week. After three months he bought out the interest of one of the barbers in the shop where he worked and six months later purchased the interest of the other, thereafter employing the two barbers to work for him. He later purchased a second barber shop which he operated on a commission basis. While operating the barber shop business petitioner began handling tobacco products, at first vending cigarettes on a small scale and later other tobacco products from the shop where he worked. He later rented space adjoining the barber shop and added barber and beauty supplies. During the years 1916-1929 the petitioner entered into the following real estate transactions: Consideration
Date Pur-
Mort-
Date
Selling
chased
Cash
gage
Sold
Price
7- 3-16
$ 330
4-26-19
$ 3,150.00
5-29-19
2,500
$2,500
5- 7-29
13,858.52
6-11-19
650
1,900
7- 2-19
1,900
2,100
1-13-20
700.00
1-13-20
700
2- 3-20
5,000.00
3-25-24
4,500
7-29-26
6,000.00
5-31-26
750
4,250
11-24-26
1,500.00
5- 7-29
5,805.53
On May 24, 1934, petitioner organized the Universal Distributing Company, Inc., a Louisiana corporation, to take over the *202 tobacco and supply business. The petitioner owned all of the capital stock of the corporation and that ownership was not subsequently changed. At a later date the corporation added a bar and also sold package liquor. The corporation income tax returns of Universal Distributing Company, Inc., for the fiscal years ending June 30, 1935 through June 30, 1941 disclose the following: Income or
Kind of Business
Year
(Loss)
Shown on Return
June 30, 1935
($ 713.19)
Barber Supplies, To-
bacco
June 30, 1936
( 468.13)
Tobacco and Barber
Supplies
June 30, 1937
( 256.46)
Tobacco Supplies
June 30, 1938
( 86.44)
Tobacco Supplies
June 30, 1939
( 22.50)
Wholesale Tobacco
June 30, 1940
351.47
Tobacco Supplies
June 30, 1941
( 4,080.61)
Wholesale and Retail
Tobacco and Liquor All of the foregoing returns were signed by Vincent Cefalu as president. Universal Distributing Company, Inc., did not declare or pay any dividends during the period of its operations and none of its officers received a salary. Universal Distributing Company, Inc., in about 1940, became engaged in the operation of music box routes. It purchased an existing route with its *203 machines from an operator. The route manager and maintenance man for the former business became the employee of petitioner. At this time the company acquired a number of cigarette vending machines and later purchased additional machines for the route from other operators. On its income and excess profits tax return for the fiscal year ending June 30, 1940, Universal Distributing Company, Inc., listed as a "victrola" depreciation deduction the amount of $1,150. For the fiscal year ending June 30, 1941, the corporation deducted $1,610.62 as depreciation on "Victrolas, Vending Machines, and Pin Ball Machines." On or about April 25, 1940, petitioner borrowed $1,200 from the City National Bank, Baton Rouge, Louisiana, for which he signed three notes and gave a second mortgage on his home. The loan was repaid on February 5, 1941. Petitioner borrowed on his life insurance in 1940 a total of $681. Such loans were repaid on April 17, 1945. On January 13, 1941, petitioner executed a chattel mortgage to Joyce Laundry as collateral security for a loan in the amount of $10,000. The res of such mortgage consisted of 92 itemized pinball machines and 42 itemized cigarette vending machines. This *204 mortgage appears on the petitioner's liability ledger sheet at the Fidelity Bank and Trust Company under the name of Universal Distributing Company and Vincent Cefalu. Universal Distributing Company, Inc., was liquidated in 1941. The following assets and liabilities were transferred to petitioner: ASSETS
Land
$ 4,500
Brick Apartment
21,000
Duplex Apartment
6,500
Garage Apartment
3,000
Furnishings
3,000
Vending Machines
7,000
Total
$45,000
LIABILITIES
Accounts Payable
$ 2,000
Notes Payable
450
Notes Payable - Mortgage
30,000
Total
$32,450
After liquidation of the corporation in 1941, petitioner organized Universal Distributing Company, a sole proprietorship, in Baton Rouge, Louisiana. The checking account in the name of the Universal Distributing Company was maintained and petitioner opened bank accounts in the names of (1) Vincent Cefalu - Rent Account, and (2) Vincent Cefalu - Phonograph Account. Petitioner owned the business known as Universal Distributing Company; however, it was operated in the name of R. M. Maggio, petitioner's brother-in-law, since petitioner was an alien and as such could not secure the necessary licenses to buy *205 and sell liquor. The informal agreement with Maggio was such that if the liquor department made a profit, Maggio would share in such profit plus receiving a weekly salary. Maggio received a weekly salary of $25 from 1943 through 1945. He received a bonus of $300 in 1943 and $1,000 in 1944. Maggio reported the income and expenses of Universal Distributing Company on his and his wife's returns for the years 1943-1945. Maggio did not prepare the returns nor have them prepared. The returns were given to him for signature by petitioner and Maggio and his wife signed them without question. The income and expense of Universal Distributing Company as reported on the returns of Maggio and his wife for the years 1943-1945, inclusive, was as follows: 1943
1944
1945
Gross Receipts
$284,313.38
$336,314.98
$295,277.87
Cost of Goods
Sold
270,709.31
325,065.80
284,256.37
Expenses
9,174.78
6,209.16
5,341.18
Net Profit
4,429.29
5,049.02
5,680.32
Maggio did not report on his return any salary or bonus received from petitioner in any of the years 1943-1945. The sole income reported on these returns was the net profit from petitioner's business, Universal Distributing *206 Company. The following income tax shown on the returns of Maggio and his wife for the years 1943-1945 was paid by petitioner: Marguerite
Year
R. M. Maggio
Maggio
1943
$ 45.26
$ 45.26
1944
305.00
305.00
1945
372.00
473.00
On his individual income tax returns for the years 1943-1945 petitioner did not report any income from the Universal Distributing Company. Petitioner did report income and expense as follows: 1943
1944
1945
Rent
$ 7,435.00
$ 9,535.00
$14,673.50
Phonographs
13,064.85
12,064.65
11,555.00
Total Receipts
$20,499.85
$21,599.65
$26,228.50
Expenses
16,495.65
16,360.43
15,561.76
Net Profit
$ 4,004.20
$ 5,239.22
$10,666.74
In 1944 an agent of respondent visited the premises of petitioner in connection with the tax liability of petitioner and Universal Distributing Company, Inc., for the years 1941 and 1942. Petitioner had not filed any tax return for the year ending June 30, 1941, and the examining agent prepared and filed the return. The agent made certain adjustments to the return filed by the petitioner for the year ending June 30, 1942. The agent's report for the year ending in 1942 discloses *207 that petitioner had owned "vending machines" having a total value of $7,000 and that petitioner "junked" vending machines in the amount of $1,500 as of June 30, 1942. Petitioner rented a safety deposit box at the Fidelity National Bank in May 1944. On or about August 31, 1945, petitioner purchased 500 shares of R. J. Reynolds Tobacco Co. stock in the name of his daughter, Bertie Lou Cefalu, for $18,633. The money to pay for such stock was taken from the safety deposit box by Bertie Lou. In 1946 an examining agent of the respondent again visited the premises of petitioner and examined into his income tax liability for the calendar years 1943 and 1944, returns for which had been received in the office of the collector of internal revenue for the district of Louisiana on March 15, 1944, and March 15, 1945, respectively. Subsequent to the examination by the agent in 1946, the petitioner was assessed an amount for income taxes for the years 1943 and 1944 in addition to the amount reflected on his returns for such years. Such additional amount was duly paid by the petitioner. Petitioner's returns for the years 1943 and 1944 as adjusted by the agent did not reflect the income and expenses *208 of the Universal Distributing Company. Sometime prior to December 31, 1945, petitioner discussed with his brother, Joe Cefalu, the formation of a partnership; however, due to disagreement on the valuation of inventories, the partnership was not formed. On December 31, 1945, petitioner organized a business known as Cefalu Distributing Company, as a partnership among three of his children, Sam, Bertie Lou, and Joe C., who put no capital into the business but performed certain services in connection with its conduct. A partnership agreement was signed by the three children reflecting that they were the sole and only members of a partnership known as Cefalu Distributing Company. In connection with the formation of Cefalu Distributing Company, the three children of petitioner mentioned above entered into a contract with R. M. Maggio to acquire the entire assets and liabilities of Universal Distributing Company. The contract provided that in return for transferring such assets and liabilities to the partnership Maggio should receive in cash the amount of $200. Maggio did not receive the consideration stated in the agreement or any other amount. In 1947 another child of petitioner, Madeline, *209 took the place of Sam Cefalu in Cefalu Distributing Company. In connection with Cefalu Distributing Company, petitioner had complete charge in running the business. Sam Cefalu stamped cigarettes and did odd jobs. He understood the business was some kind of a partnership but had never discussed its formation with his brother and sister. Joe C. Cefalu engaged in arranging stock, stock control, and filling orders. His understanding was that the partnership was composed of petitioner, his brother, his older sister, and himself. Joe C. understood that he was to do what his father said in the operation of the business. Bertie Lou believed that the business was her father's basically and that she was working there in lieu of working somewhere else for a salary. By letter dated March 29, 1946, petitioner advised the collector of internal revenue at New Orleans, Louisiana, of the acquisition by Cefalu Distributing Company of the business of the Universal Distributing Company. The gross receipts, cost of goods, miscellaneous income, expenses, and net profit or loss reported on the partnership return of the Cefalu Distributing Company for the years 1946 and 1947 are as follows: 1946
1947
Gross Receipts
$285,293.26
$193,523.59
Cost of Goods
285,571.03
182,340.04
Miscellaneous Income
496.08
5,000.00
Expenses
842.87
10,001.14
Net Profit or (Loss)
(624.56)
6,182.41
*210 In the year 1947 the amount of $4,800 was deducted on the partnership return of Cefalu Distributing Company as Manager Bonus (Vincent Cefalu). Such amount was reported upon petitioner's income tax return for 1947. The distribution of net profit or loss of Cefalu Distributing Company shown on the partnership returns for the years 1946 and 1947 is as follows: 1946
1947
Joe C.
($208.18)
$1,360.81
Bertie Lou
( 208.18)
1,360.80
Sam
( 208.17)
Madeline
1,360.80 In addition to their distributive shares of the net profit, Bertie Lou and Madeline received $1,400 and $700 salary, respectively, in 1947. The children reported such amounts of net income, loss, and salary on their income tax returns for the years 1946 and 1947. In a letter dated January 18, 1946, to the American Tobacco Company, regarding the ownership of Universal Distributing Company and Cefalu Distributing Company, petitioner stated in part as follows: "This will refer to your letter of January 15, in which you request information regarding my new business name, for your information Cefalu Distributing Company, is the same as Universal Distributing Co., that assets and liabilities are *211 the same and ownership has not been changed." * * *
Petitioner executed a "guaranty" to the R. J. Reynolds Tobacco Company dated July 14, 1947, wherein he guaranteed and held himself responsible for the payment at maturity of the purchase price of all goods sold by the R. J. Reynolds Tobacco Company to Cefalu Distributing Company. In 1946 petitioner employed Paul A. Bartmess as a bookkeeper. In connection with his employment, Bartmess maintained a cash journal for petitioner's rental business, coin machine business, and Cefalu Distributing Company. In the course of his employment, Bartmess prepared the petitioners' 1945 income tax returns as well as those of Maggio and his wife, and signed the jurat thereon. The returns were prepared from the books and records of the petitioner. The books and records were prepared and kept by someone other than Bartmess. Bartmess kept the books and records of petitioner and Cefalu Distributing Company for the entire year of 1946 and a part of 1947. In connection with his keeping such books, Bartmess entered only such transactions of which he was advised or received documentary evidence from the petitioner or others in the business. The *212 petitioner was operating coin operated gambling machines during the time Bartmess was employed by the petitioner. Income from such gambling devices was not reported as such on any of the ledgers kept by Bartmess. Bartmess kept an equipment account in connection with the books and records. In this account Bartmess recorded purchases of various articles of equipment purchased by petitioner, including coin operated gambling machines. Such machines were not listed on petitioner's income tax returns for the year 1946 and a depreciation deduction was not claimed for such machines. Petitioners' 1946 income tax returns were prepared from the books kept by Bartmess. Bartmess did not sign the jurat on such returns. The ledger account for petitioner's phonograph business for the year 1946 disclosed the following: Collection - Phonograph
Receipts
Deposits
Total
$20,404.59
$23,873.09
Purchases of coin machine equipment are reflected in petitioner's equipment ledger account for the year 1946 in the amount of $47,629.14. Milton Plitt, at present a certified public accountant, was employed by petitioner to prepare the 1947 returns of petitioner, his wife and Cefalu *213 Distributing Company. In addition, Plitt prepared the returns of petitioner's children for such year. Plitt was not a certified public accountant at the time he was employed. He did not make an audit of the books and records of Vincent Cefalu's rent or phonograph operations and/or Cefalu Distributing Company. When Plitt prepared the returns, the books of the Cefalu Distributing Company were incomplete and he resorted to other evidence of transactions to prepare such returns. In arriving at the net income shown on their returns for the taxable years 1946 and 1947, petitioners reported the following income and claimed the following deductions: Rent
Phonograph
Rent
Phonograph
Other
Income Reported
1946
1946
1947
1947
1947
Rent
$18,008.87
$21,873.92
Phonographs
$20,404.59
$28,799.55
Cefalu Distributing Co.
$4,800.00
Total Income Reported
$18,008.87
$20,404.59
$21,873.92
$28,799.55
$4,800.00
Total Deductions Claimed
10,358.55
19,753.83 *
14,232.92
33,998.13
Net Income or Loss Reported
7,650.32
650.76 *
7,641.00
(5,198.58)
4,800.00
Collections from petitioner's coin machines were *214 made by a route man who recorded the amount of such collections on a collection report which he then signed together with the owner of the premises where the machine was located. Collection reports and the collections ledger account relating to petitioner's coin machine business reflect collections for the years 1946 and 1947 as follows: Collection
Ledger
Year
Reports
Account
1946
$16,233.05
$20,404.59
1947
27,904.05
3,806.25 *
Petitioner's and his wife's individual income tax returns for the years in issue were assigned to a special agent and an internal revenue agent for a joint investigation in 1950. Petitioner was cooperative with the agents and made no objection to their examination of his books and records. The books of petitioner were not complete. The cash receipts and disbursements journal of Universal Distributing Company for the years 1943-1945 disclosed many erasures of original cash sale entries and subsequent overwrites. In almost all of the decipherable alterations the original entry was for a larger amount than that of the subsequent overwrite. In connection with his operation of coin *215 operated amusement devices, petitioner at various intervals acquired new machines. In making such acquisitions, the petitioner usually traded used machines for the new ones and accordingly paid a lesser amount of cash for the new machine. On occasions petitioner turned in old machines prior to purchasing new ones. The trade-in value of such machines accordingly was set off against the price of the new machines which the petitioner subsequently acquired. Petitioner had notes payable in the amount of $32,000 as of December 31, 1947. In 1947 petitioner sold to Tullis Brady a car which he had purchased that year. In determining the petitioner's net worth, respondent incorrectly listed the cost of such car in the assets of petitioner for 1947. As adjusted, petitioner's investment in business furniture, fixtures, and equipment as of December 31, 1947, was $13,460.98. Also, in 1947, petitioner purchased some coin machines for his son, Sam Cefalu. Prior to December 31, 1947, Sam paid on account of the total price of such machines the amount of $1,400. Respondent did not credit the petitioner's investment in coin machines with such amount. As adjusted, petitioner's investment or trade-in *216 credit in coin machines was as follows: Year
Purchases
Cost December 31
1942
$ 5,500.00 *
1943
$ 306.17
5,806.17
1944
227.25
6,033.42
1945
1,123.23
7,156.65
1946
43,894.73
51,051.38
1947
28,116.87
79,168.25
The net worth of petitioner was as follows: 12/31/42
$ 10,108.67
12/31/43
32,615.02
12/31/44
71,224.68
12/31/45
153,068.90
12/31/46
175,817.57
12/31/47
204,130.56
During the years involved, petitioner was supporting two daughters in addition to his wife and himself. His personal, nondeductible expenses during this period, consisting of income taxes and insurance premiums paid and an estimated amount for groceries, clothing, household items and medical bills, were as follows: Insur-
Esti-
Taxes
ance
mated
Year
Paid
Premium
Amount
Total
1943
$ 925.82
$698.77
$2,250.00
$3,874.59
1944
960.00
866.85
2,500.00
4,326.85
1945
597.65
688.14
2,750.00
4,035.79
1946
2,544.46
683.10
3,000.00
6,227.56
1947
332.00
678.00
3,250.00
4,260.00
*217 The increase in net worth, personal expenses, and taxable income of petitioners were as follows: Increase in
Personal
Taxable
Net Worth
Expenses
Income
12/31/43
$22,506.35
$3,874.59
$26,380.94
12/31/44
38,609.66
4,326.85
42,936.51
12/31/45
81,844.22
4,035.79
85,880.01
12/31/46
22,748.67
6,227.56
28,976.23
12/31/47
28,312.99
4,260.00
32,572.99
Petitioner and his wife filed no income tax returns for the years 1920-1923. No tax was reported or paid on returns filed for the years 1924-1935. No returns were filed for the years 1936-1940. On December 4, 1940, petitioner was found guilty of intent to defraud the State of Louisiana of its revenue by having 227 cartons of cigarettes concealed in his attic, not properly stamped with revenue stamps of the State of Louisiana. Petitioner was indicted for willful attempted evasion of Federal income taxes for the years 1946 and 1947. He pleaded not guilty to the indictment, but upon advice of counsel subsequently changed such plea to nolo contendere. As a result of the latter plea, petitioner was sentenced to 181 days and fined $2,000. Petitioner had no substantial amount of cash on hand *218 as of December 31, 1942. Petitioner was the owner of Cefalu Distributing Company during the years 1946 and 1947. The income of petitioners for the years 1943 through 1947 was understated and a part of the resulting deficiency of Vincent Cefalu for each of the years was due to defraud with intent to evade tax. The petitioner, Vincent Cefalu, filed a false and fraudulent return with intent to evade tax for each of the years 1943 and 1944. Opinion Inasmuch as the petitioner, Vincent Cefalu, has offered no evidence to refute the amount of the deficiencies determined against him by respondent for the years 1943 and 1944, we first consider the question whether respondent is barred from assessing and collecting such deficiencies. On brief, petitioner states that he does not question the accuracy of the amounts of the deficiencies determined but relies upon the bar of the statute of limitations, section 275(a) of the Internal Revenue Code of 1939, [1] and the further contention, first posed at the hearing and on brief, that respondent is precluded from determining any deficiencies for 1943 and 1944, (1) by reason of his failure to comply with the provisions of section 3631 of the *219 Internal Revenue Code of 1939, [2] and (2) because, he alleges, the returns for those years were prepared by respondent's agent in the course of a field audit of petitioner's books and records and accordingly, respondent should not be allowed "to impeach his own handiwork." *220 In answer to these contentions, respondent has alleged, and offered proof in connection therewith, that petitioner filed a false or fraudulent return with intent to evade tax for each of the years 1943 and 1944, and accordingly, under the provisions of section 276(a) of the Internal Revenue Code of 1939, [3] that the deficiencies determined for those years are not barred. He further argues that section 3631, providing for a written notice prior to re-examination of a taxpayer's books and records, does not invalidate any deficiency resulting from such re-examination, and that failure to make timely objection to the later examination may be taken as a waiver of the protection afforded by the statute. Before considering the fraud issue, it may be appropriate to dispose of petitioner's contention *221 based upon section 3631. In that connection, it appears that in the course of a field audit made in 1946 an internal revenue agent examined the records of the petitioner relating to his income tax liability for the years 1943 and 1944. In 1950, two other agents of the respondent re-examined the records of the petitioner for such years without notifying the petitioner in writing that such re-examination was necessary. Petitioner did not object to the re-examination at the time it was made. The issue now presented was not raised in the petition but was raised orally by counsel for the petitioner for the first time at the hearing. It has long been established by decisions of this Court and others that failure of the Commissioner to comply with the provisions of section 3631 relating to written notice prior to a re-examination of a taxpayer's books and records does not invalidate a deficiency determined upon information derived from such an examination, and also that failure to make timely objection to such re-examination may be taken as a waiver of the protection afforded by the statute. *222 Leslie A. Sutor, 17 T.C. 64; J. S. McDonnell, 6 B.T.A. 685; Philip Mangone Co., Inc. v. United States (Ct. Cls.), 54 Fed. (2d) 168; Glassell v. Commissioner (C.C.A. 5-1930), 42 Fed. (2d) 653; Blevins v. Commissioner, 238 Fed. (2d) 621, affirming per curiam a Memorandum Opinion of this Court [14 TCM 840, T.C. Memo. 1955-211]. Accordingly, petitioner's contention based upon section 3631 may not be sustained. There is also no merit in the second ground asserted by petitioner. Petitioner's contention is apparently based upon the testimony of respondent's agent McCollister, on cross-examination, that petitioner's returns for 1943 and 1944 were prepared upon the basis of an examination made by Boeker, a deputy collector, in 1946. The original income tax returns filed by petitioner for 1943 and 1944 (Resp's exhibits NN and OO), each of which was signed by petitioner Vincent Cefalu, bear the stamp of the collector of internal revenue for the district of Louisiana, indicating that such returns were received in the office of the collector on March 15, 1944 and March 15, 1945, respectively. Obviously neither *223 of said returns could have been prepared by an agent of respondent in 1946, and petitioner's contention is without foundation in fact. Although the record is not clear, it is apparent that the witness, McCollister, was either mistaken in his testimony regarding the preparation of the 1943 and 1944 returns or that he had in mind adjustments which respondent's former agents had made in 1946 and as the result of which petitioner paid additional taxes for 1943 and 1944, in February 1946. Our examination of the returns, as well as Boeker's memorandum dated January 22, 1946 (Petr's Ex. 32) leads us to the latter conclusion. Petitioner, on whom the burden lay, has not shown it to be otherwise. The adjustment of petitioner's 1943 and 1944 income tax liability made by an agent of respondent in the course of a field audit in 1946, does not preclude respondent from making further adjustments due to fraud at a later date. Younker Brothers, Inc., 8 B.T.A. 333. See also Thomas J. McLaughlin, 29 B.T.A. 247; Middleton v. Commissioner (C.A. 5), 200 Fed. (2d) 94, affirming a Momorandum Opinion of this Court [10 TCM 592,]. Having concluded *224 that respondent was not otherwise precluded from determining the deficiencies for the years 1943 and 1944, we next consider whether the returns filed by petitioner for those years were false or fraudulent with intent to evade tax so as to render respondent's determination timely with the provisions of section 276(a). Here the burden is upon the respondent. Section 1112, Internal Revenue Code of 1939. We think respondent has sustained that burden and have found as a fact that petitioner filed a false or fraudulent return with intent to evade tax for each of the years 1943 and 1944. Petitioner not only failed to maintain proper, adequate and complete records of all his business activities, but made and caused to be made alterations in some of the records which he did maintain, more particularly in the cash receipts journal of the Universal Distributing Company throughout the years 1943 and 1944 (as well as 1945), wherein with respect to some 150 (200 if 1945 is included) items "cash sales" were made to reflect lesser amounts received than were originally recorded therein. Using such altered amounts petitioner caused returns for such income to be made in the name of R. M. Maggio, his *225 brother-in-law. Petitioner's explanation that he operated the Universal Distributing Company in his brother-in-law's name because he himself, being an alien, was unable to secure liquor license in his own name, does not alter the fact that petitioner was admittedly the owner of the Universal Distributing Company, a sole proprietorship, and received all the income therefrom, notwithstanding which he knowingly and willfully failed to report any income, altered or otherwise, from such source on his own income tax returns for any of the years 1943 to 1945, inclusive. Accordingly, we hold that the assessment and collection of the deficiencies determined by respondent for the years 1943 and 1944 are not barred by limitations. Section 276(a), Internal Revenue Code of 1939. It likewise follows from what we have said that at least a part of the deficiencies for each of the years 1943 and 1944 was due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939, and that the assessment and collection of the additions to tax imposed thereby are not barred by limitations. With respect to the years 1945, 1946 and 1947, petitioners no longer question *226 the timeliness of respondent's determination of the deficiencies for those years. They also do not question the propriety of respondent's use of the net worth method in computing the deficiencies, but challenge the accuracy of the computations particularly with respect to certain items. The following discussion is accordingly limited to the various items left in dispute. Cash on Hand Respondent's net worth computation did not include in the assets of petitioner any amount of cash on hand for any of the years in issue. Petitioner contends that as of December 31, 1942, he had around $40,000 in cash which he kept in a jar under the ground in his basement. He asserts that this money was accumulated over a period of years beginning in 1912 when he came to this country and that about $27,000 of such amount was derived from real estate transactions entered into between 1916 and 1929, the balance having been accumulated from various other business deals. The reason advanced for keeping the cash in the basement was that it was necessary for trading purposes. We are unable to sustain petitioner's contention. Petitioner told the agents in the course of their examination that he had no *227 cash other than that reflected in bank accounts and daily operating cash used in his business as of December 31, 1942. Petitioner filed no Federal income tax returns for the years 1920-1923, or for the years 1936-1940. On returns filed for the years 1924-1935, no tax was reflected. On or about April 25, 1940, in connection with the purchase of a home, petitioner borrowed $1,200, signing three notes and giving a second mortgage on the home. The loan was not repaid until February 5, 1942. Petitioner also borrowed on his life insurance in 1940 a total of $681. Such loans were not repaid until April 16, 1945. Petitioner received no salary and was paid no dividends by the Universal Distributing Company, Inc. during the period 1934 to 1941 it was in operation. According to the corporate returns filed for such company which petitioner signed as president, it sustained losses each year, except one, aggregating $5,627.33. For the year ending June 30, 1940, its income amounted to only $351.47. When liquidated in 1941 and its assets distributed to petitioner, its assets ($45,000) exceeded liabilities ($32,450) by $12,550. Except for $7,000 allocated to vending machines, its assets consisted of *228 land, apartment buildings and furnishings, and $30,000 of its liabilities represented notes payable on mortgages. We have no way of determining how much net profit petitioner had at the end of his real estate transactions during the period 1916 to 1929. Some of the money received from the sale of real estate during the earlier years was used to acquire some of the property purchased in the later years. It is reasonable to assume that some portion of such profits went for living expenses since he had a large family to support and for all but the initial purchase in 1916 he gave substantial mortgages. There is also evidence that he spent some money improving the lots before resale. It is also reasonable to assume that the $3,000 petitioner claimed to have paid in for the stock of the Universal Distributing Company, Inc. was derived from the profit he made in the real estate transactions in 1916 to 1929. We are not advised as to the source of other money used to acquire the assets of the Universal Distributing Company, Inc. The only person other than Vincent who is claimed to have known about the "buried" cash and who might have corroborated his testimony is petitioner's wife. However, *229 although she is also a petitioner herein, she was not called upon to testify and no reason was given for her absence. Considering all the circumstances we are not convinced that petitioner had any substantial amount of cash on hand at the beginning of the taxable years involved. Undoubtedly he had some cash at the beginning of each year, but considering all the circumstances it is not believed to have varied materially from that on hand at the end of the year. Certainly petitioners have not shown it to be otherwise. Consequently cash on hand is of no material importance in determining the increases in petitioners' net worth. Music boxes on hand The petitioner contends that the value of music boxes and vending machines on hand as of December 31, 1942 was no less than $23,775. The respondent determined the value of coin-operated machines as of December 31, 1942 was $5,500, basing such determination on the value of such machines received by petitioner pursuant to the liquidation of Universal Distributing Company, Inc. Petitioner contends that in determining the value in such manner the respondent failed to include the value of any of the music boxes on hand, and no music boxes were *230 owned by the corporation but had always been owned exclusively by the petitioner. Petitioner introduced into evidence a chattel mortgage dated January 13, 1941, which mortgage listed 92 music boxes and 42 cigarette vending machines as collateral security to guarantee the reimbursement of the mortgagee (apparently the nominee of the Fidelity Loan and Trust Company) in the amount of $10,000 which the mortgagee had loaned to the petitioner. An officer of the Fidelity Loan and Trust Company testified that the policy of the bank on loans secured by chattel mortgages was to loan no amount greater than two-thirds of the value of the mortgaged property. Further evidence was introduced in the form of bank liability ledger sheets showing that petitioner subsequently had placed more machines as collateral for such loan. Petitioner's contention that the corporation owned no music boxes during its existence is contradicted by the corporation's income tax returns for the years 1940 and 1941. On such returns the corporation claimed as a deduction in 1940 depreciation in the amount of $1,150 on "victrolas," and in 1941 a deduction in the amount of $1,610.62 for depreciation allowable on "Victrolas, *231 Vending Machines, and Pin Ball Machines." Furthermore, at the time the chattel mortgage was executed, the Universal Distributing Company, Inc. had not been liquidated and the entry in the bank liability ledger indicates that these machines were a part of the corporation's property. Since respondent considered the value of machines petitioner received upon the liquidation of the corporation it appears that the machines covered in the chattel mortgage were included in respondent's determination. It is also noted that on petitioner's income tax return for 1943 the value of "vending machines" lisited for depreciation amounted to $5,500. There is no listing of other coin machines on such return. The burden is on petitioner to overcome the presumptive correctness of respondent's determination. Considering all of the facts pertaining to the value of such machines as of December 31, 1942, we find that petitioner has failed in his burden and accordingly the determination of the respondent must be sustained. Petitioner also contends that the respondent should have credited the petitioner with the *232 amount of net income reported in the return of R. M. Maggio for the year 1945. Such contention cannot be sustained. Income is taxed to the owner thereof, Lucas v. Earl, 281 U.S. 111, and the fact that petitioner's income was reported in Maggio's returns does not justify its exclusion from petitioner's taxable income. The petitioner has also disputed the accounting techniques of respondent respecting depreciation in making the net worth determination. Suffice it to say that respondent's computation with the adjustments hereinafter indicated, gives a true picture of the net value of petitioner's assets at the end of each of the years in issue and that this technique was accepted by the Supreme Court in Holland v. United States, 348 U.S. 121. Petitioner has also disputed the respondent's determination of the value of coin machines on hand with respect to the treatment of trade-ins. Petitioner contends that where such machines were traded in and a credit against a future purchase was received, the value of coin machines on hand should be reduced to reflect the value of the machines traded in. However, since the petitioner has not shown that any such delayed *233 trade-ins existed as of December 31 for any of the years in issue, he accordingly has not shown any inaccuracy in respondent's determination which was computed for such dates. There is some merit, however, in petitioner's contention regarding the value of music boxes on hand as of December 31, 1947. Petitioner's books disclose that during 1947 he purchased some coin machines for his son, Sam Cefalu. Such machines were apparently included in the assets of petitioner in respondent's net worth computation. However, the books disclose that Sam had paid petitioner.$1,000 on account before December 31, 1947. We have reduced the respondent's determination of the value of coin machines on hand as of such date to reflect such payment by Sam. We have also adjusted the 1947 net worth determination of respondent with respect to the value of business furniture, fixtures, and equipment. Petitioner's books disclose that a Chevrolet automobile included in such net worth determination was sold to Tullis Brady prior to December 31, 1947. We have reduced the net worth determination for December 31, 1947, to reflect this transaction. The petitioner further contends that the amount of tax reflected *234 on the returns of R. M. Maggio and his wife for the year 1945, which tax was paid by petitioner, must be taken into account in determining the amount of petitioner's deficiency for such years. We agree petitioner is entitled to some allowance for the taxes thus paid. Cf. Bailey v. United States, (Ct. Cls.), 104 Fed. Supp. 997; Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871. But not for the full amount thereof. It is true that respondent has determined, and we have found as a fact that the returns of Maggio and his wife reflected only the amount of income of the Universal Distributing Company (petitioner's sole proprietorship) and that such income is includible in the gross income of petitioner for such year. However, the return which petitioner had prepared for the Maggios did not include any personal income received by Maggio upon which he and his wife were liable to tax. There is no evidence any other returns were filed for 1945 by Maggio and his wife as was the case of the person whose name was used by the taxpayer in the Bailey case, supra, and the Maggios are not fictitious persons as was the case in Lipsitz, supra. *235 The evidence herein indicates that Maggio received taxable income in 1945 at least in the amount of $1,300 ( $25 per week). If credit is given petitioner for the full amount of tax paid by him on the Maggio returns it might result in depriving the Government of taxes to which it is rightfully entitled on the Maggio income. The situation is one brought about by petitioner's own fraud and he should not be permitted to profit thereby. Accordingly we hold that petitioner is entitled to credit for the amount of taxes paid by him on the Maggio returns for 1945 less the amount of taxes, if any, to which the Government was rightfully entitled from R. M. Maggio and his wife for such year. The correct amount may be determined in the computation under Rule 50. Fraud We have heretofore, in connection with our consideration of the limitations question respecting the taxable years 1943 and 1944, determined that at least a part of the deficiencies for each of those years was due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939. There remains to be determined whether any part of the deficiencies for the years 1945, 1946 and 1947 was due *236 to fraud with intent to evade tax so as to subject the petitioner, Vincent Cefalu, to liability for the additions to tax imposed by section 293(b). As previously noted, the burden of proving that any part of the deficiencies was due to fraud with intent to evade tax is upon respondent. Section 1112, Internal Revenue Code of 1939; W. A. Shaw, 27 T.C. 561. Such proof must be clear and convincing. Arlette Coat Co., 14 T.C. 751. The same reasons which impelled our holding that at least a part of the deficiencies for each of the years 1943 and 1944 were due to fraud with intent to evade tax are likewise applicable to the year 1945, during all of which years the petitioner operated the Universal Distributing Company as a sole proprietorship but failed to include any of the income therefrom in his individual income tax returns. In addition thereto, the net worth computation of respondent, as adjusted by us, discloses that for each of the taxable years in issue, 1943 to 1947, inclusive, petitioner reported less than one-third of his taxable income. The consistent and *237 substantial understatement of net income has frequently been held to be persuasive evidence of fraud. United States v. Calderon, 348 U.S. 160; Arlette Coat Co., supra. It also appears that in 1946 and 1947, petitioner did not include in his returns any part of the income of the Cefalu Distributing Company, other than a so-called "Manager bonus" in the amount of $4,800 in 1947. In this connection, it is petitioner's contention that the Cefalu Distributing Company was a partnership owned entirely by his children, Joe C., Bertie Lou, Sam, and/or Madeline. We have found as a fact, however, that the business of the Cefalu Distributing Company, during the years 1946 and 1947, was owned by petitioner. The children furnished none of the capital and the only services performed by them were of a minor clerical nature. Petitioner managed the business and testimony of the children indicates a lack of any clear understanding that the business belonged to them and not to their father. Moreover, petitioner advised suppliers that the business was his and guaranteed its accounts. There is also evidence, as pointed out in our findings, that in 1946 and 1947 petitioner *238 failed to report all income received by him from rentals and coin-operated machines. Finally, it is to be noted that petitioner pleaded nolo contendere to an indictment returned against him in the District Court of the United States charging him with willful attempted evasion of Federal income taxes for the years 1946 and 1947. As the result of this plea he was sentenced to serve 181 days and fined $2,000. Considering all the above facts and circumstances we have found as a fact that at least a part of the deficiencies for each of the years 1945, 1946, and 1947 was due to fraud with intent to evade tax. Accordingly we hold that the petitioner, Vincent Cefalu, is liable for the additions to tax provided by section 293(b) of the Internal Revenue Code of 1939, for each of the years 1943 to 1947, inclusive. Decisions will be entered under Rule 50. Footnotes
*. Corrected figure.↩
*. Complete only from 1/1/47 to 3/10/47.↩
*. The amount of $5,500 is reflected in the equipment ledger account as of January 1, 1946, and is also reflected in petitioner's return for the year 1943, on which depreciation is claimed. No other coin machines were listed on such return.↩
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. ↩
2. SEC. 3631. RESTRICTIONS ON EXAMINATION OF TAXPAYERS. No taxpayer shall be subjected to unnecessary examinations or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.↩
3. SEC. 276. SAME-EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩